IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| BELLE GARDEN ESTATE, LLC, and<br>CHARLES RUSSELL, | )<br>)<br>) | |
| Plaintiffs, | )<br>) | Civil Action No. 7:21cv00135 |
| v. | )<br>) | **MEMORANDUM OPINION** |
| The Honorable RALPH S. NORTHAM, | )<br>)<br>) | By:   Hon. Thomas T. Cullen<br>        United States District Judge |
| Defendant. | ) | |

Plaintiffs Belle Garden Estate, LLC, and its owner, Charles Russell, (collectively "Belle Garden" or "Plaintiff") sued the Hon. Ralph S. Northam, Governor of Virginia, for alleged violations of their constitutional rights through the enforcement of the Governor's COVID-19 restrictions on individuals and businesses, as detailed in Executive Order 72. Plaintiff also asks this court to issue a preliminary injunction, suspending enforcement of Executive Order 72 until the case can be decided on the merits. Because Belle Garden's underlying claims are unlikely to succeed on the merits, its only damages are monetary, and the countervailing public interest counsels caution in this scenario, the court will deny Plaintiff's request for a preliminary injunction.

## I.   BACKGROUND

On March 30, 2020, as the rising threat of the COVID-19 pandemic became evident, Governor Northam issued Executive Order 55, which, among other things, instructed all Virginians to remain in their places of residence with limited exceptions. This restriction remained in effect until May 15, 2020, when the Governor began a multi-phase process for

easing the state back into normal life. That process has taken substantially longer than anticipated and restrictions have fluctuated, often unpredictably, based on dramatic spikes and declines in COVID-19 infection and hospital-admission rates. During that time, more than 10,000 Virginians have died as a result of the COVID-19 virus. But after a year of restrictions and the advent of mass vaccination, COVID-19 trends in Virginia have been encouraging since at least February of this year. In light of those positive trends, the Governor issued the operative version of Executive Order 72 on February 24, 2021, to take effect on March 1, 2021. Order 72 eases restrictions on many businesses, including entertainment and amusement businesses such as theme parks and zoos. According to the Order, entertainment and amusement businesses may operate at 30% capacity, up to a maximum of 250 guests for indoor venues and 1,000 for outdoor venues. If, however, a business hosts a private booking, it is limited to a maximum of 10 people for an indoor venue and 25 people for an outdoor venue.

Plaintiff Belle Garden Estate is a wedding venue in Franklin County. Under Order 72, Belle Garden may not host private bookings—including weddings—for events with more than 25 people. It alleges that the restriction on its capacity violates the First and Fourteenth Amendments by preventing wedding venues from holding nonreligious ceremonies with more than 25 attendees, while allowing other businesses, such as amusement parks, to operate with much larger maximum capacities.

## II. ANALYSIS

This matter is before the court on Belle Garden's motion for a preliminary injunction. Plaintiff asks this court to enjoin enforcement of Executive Order 72 and allow it to host

weddings of any size. Because Belle Garden has not demonstrated that any of the relevant considerations weigh in favor of an injunction, the motion will be denied.

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). Parties seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. While preliminary injunctions are always extraordinary remedies, mandatory preliminary injunctions—that is, injunctions that alter the status quo instead of preserving it—are granted even more sparingly. Here, Belle Garden asks the court to suspend the enforcement of an Executive Order that has been in effect since March 1, 2021. This kind of injunction "normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980). Such exigencies are present only where the injunction is "necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003).

Belle Garden has failed to demonstrate that any of the four relevant considerations weigh in favor of an injunction. It has not shown a likelihood of success on the merits; it has not demonstrated (or even pleaded) any irreparable harm; and it has not shown that the equities or public interest weigh in favor of enjoining the Governor's executive order.

### A. Likelihood of Success on the Merits

Belle Garden is unlikely to succeed on the merits for three reasons. First, the Governor is likely immune from suit; second, Belle Garden has not demonstrated a viable First Amendment claim; and third, Belle Garden is highly unlikely to meet the heavy burden applicable to its equal protection claim.

#### i. Sovereign Immunity

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI. In essence, the amendment "render[s] States immune from being hauled into federal court by private parties." *Wright v. North Carolina*, 787 F.3d 256, 261 (4th Cir. 2015). While the text of the amendment only renders states immune from suits by citizens of other states, the Supreme Court has recognized that the protections of sovereign immunity reach beyond the words of the amendment and render states immune from suits by their own citizens as well. *See Alden v. Maine*, 527 U.S. 706, 727–28 (1999).

But state governments are not wholly immune from suit in federal court. In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court held that suits seeking to enjoin a state official from enforcing an allegedly unconstitutional statute are exempted from the doctrine of sovereign immunity. "The theory of *Ex parte Young* is that because an unconstitutional statute is void, it cannot cloak an official in the state's sovereign immunity." *CSX Transp. Inc. v. Bd. of Pub. Works*, 138 F.3d 537, 540 (4th Cir. 1998). It is based on the "legal fiction" that a state

4

officer who violates the Constitution is not acting in his official capacity. Stated differently, a state official ceases to represent the state—and therefore falls outside the protections of the Eleventh Amendment—when he attempts to use state power to violate the Constitution. *See Sch. Bd. of City of Charlottesville, Va. v. Allen*, 240 F.2d 59, 63 (4th Cir. 1956). Invoking the *Ex parte Young* exception is not as easy as alleging that a state statute is unconstitutional, however; successfully using the exception to circumvent sovereign immunity requires a plaintiff to sue the correct state official. Because the premise of *Ex parte Young* is that a particular state official loses the protection of the Eleventh Amendment through his use of state power to enforce an unconstitutional law, a plaintiff seeking to utilize the doctrine must bring suit against an official who enforces the law. That is, a state official must have a special relationship with the allegedly unconstitutional policy, and he must have "acted or threatened" to enforce the policy. *Ex parte Young*, 209 U.S. at 157; *Gilmore*, 252 F.3d at 331.

Governor Northam does not have a "special relationship" with Order 72 sufficient to vitiate his sovereign immunity from suit. Order 72 expressly delegates authority for its enforcement to executive officials other than the Governor. Enforcement of the business restrictions—the provisions challenged by Belle Garden—is delegated to the Virginia Department of Health as well as to various other executive agencies depending on the nature of the business at issue. (*See* ECF No. 1-1 at 12.) And the fact that Governor Northam created and promulgated Order 72 is not enough to create the requisite special relationship under *Ex parte Young*. "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Gilmore*, 252 F.3d at 331. Judge Arenda Wright Allen of the Eastern District of Virginia put it well in a nearly

identical case: "Applicability of the *Ex parte Young* exception turns on who has the *prospective* authority to *enforce* the law, not on who had *retrospective* authority to *create* the law." *Lighthouse Fellowship Church v. Northam*, 2021 U.S. Dist. LEXIS 19715, *17-18 (E.D. Va. Jan. 27, 2021). In order for Governor Northam to be amenable to suit under *Ex parte Young*, Belle Garden must show that he has some particular role in enforcing Order 72. *See In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (holding that the Governor was not amenable to suit in an action challenging an executive order because "[t]he power to promulgate law is not the power to enforce it."). It has not done so.

Belle Garden attempts to distinguish the relevant precedent by arguing that the cases deal with "laws" (which Belle Garden seems to understand to refer only to statutes), not executive orders. But executive orders are, in every relevant and practical sense, laws. Common usage of the word in precedent clearly encompasses executive orders, as illustrated by *Abbot* and *Lighthouse Fellowship* themselves, which both dealt with executive orders. *See Abbott*, 956 F.3d at 709; *Lighthouse Fellowship*, 2021 U.S. Dist. LEXIS 19715, at *17-18. Executive Order 72 is unquestionably a law.

Because Belle Garden has not demonstrated or pleaded that Governor Northam has a special relationship with Order 72, he is likely immune from suit and, as he is the only named defendant, Belle Garden is unlikely to succeed on the merits of its claims.

### ii. First Amendment

Even if Belle Garden could bring suit against the Governor, it could not prove any likelihood of success on the merits for either its First or Fourteenth Amendment claims. With respect to the First Amendment, Belle Garden has taken a shotgun approach. Its complaint

6

invokes freedom of assembly (more commonly known as freedom of association), (*see* ECF No. 1 at 9), while its preliminary injunction briefing implies that the basis for the claim is the right to free speech, (*see* ECF No. 6 at 3).

At argument, counsel for Belle Garden also raised, for the first time, a claim that Order 72 violates its Establishment Clause rights. But there is no hint of such a claim in Belle Garden's complaint or its briefing on the preliminary injunction. The only time the Establishment Clause is even mentioned in Plaintiff's filings is one sentence in its reply brief that addresses the issue of third-party rights. (*See* ECF No. 18 at 4.) To state a legal claim, a complaint must do at least two things. First, it must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Second, it must plead "more than labels and conclusions" such that its "[f]actual allegations [are] enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Belle Garden's complaint does neither of these things with respect to the Establishment Clause. It contains no statement regarding an Establishment Clause claim and pleads no facts that would support such a claim.[1] Without any allegations related to the

---

[1] This issue highlights a more general problem that pervades Belle Garden's constitutional claims. All of its arguments, including those in its briefing and those made at oral argument, proceed by invoking broad constitutional principles and then obscuring the particulars of its claims so that they remain as broad as possible. Despite the fact that Belle Garden's complaint only mentions violations of its rights of freedom of assembly and equal protection, it has now asserted a free speech claim, an Establishment Clause claim, a disparate impact claim based on the nature of its business, a religious discrimination claim, and violations of third-party rights to association, speech, equal protection, and freedom of contract. This approach does not satisfy the well-established standards for federal pleading or constitutional litigation. The Constitution and First Amendment within it are not monolithic entities. A plaintiff must do more than generally (and vaguely) invoke the First and Fourteenth Amendments in its complaint, and then assert, on a rolling basis, every right these constitutional provisions may protect. Belle Garden is limited to the specific allegations in its complaint, and its attempt to shoehorn in a litany of additional arguments cannot broaden the narrow claims in its pleadings. Any other

Establishment Clause or any facts that would support such allegations, Belle Garden's complaint does not contain an Establishment Clause claim, and it cannot now seek an injunction based on alleged violations of Establishment Clause rights.

Putting aside the Establishment Clause, the court will, out of an abundance of caution, construe the complaint to present both associational and speech claims. Even generously construed, Belle Garden's filings completely fail to demonstrate, to this point, any associational or speech rights that would trigger constitutional protection.

The First Amendment protects two kinds of association: intimate associations—the associations that attend one's family and personal life—and expressive associations—the associations one forms to speak, petition, or otherwise express a point of view. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984); *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 979 F.3d 219, 232 (4th Cir. 2020). This is plainly not a case of intimate association (as Belle Garden is seeking a ruling that it may host gatherings of more than 25 people with whom it has no personal relationship) and Belle Garden's pleadings do not identify any expressive purpose for the association at issue. (*See generally* ECF Nos. 1, 6, 18.) Therefore, Belle Garden has not shown a likelihood of success on the merits with respect to any associational claim.

Plaintiff's speech claim falters for a similarly basic reason. Free speech claims require speech. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989); *United States v. O'Brien*, 391 U.S. 367, 376 (1968). And while the First Amendment sweeps broadly, protecting written and verbal speech as well as expressive conduct, a plaintiff may only invoke its protections if she is engaged in

---

method would be unduly prejudicial to defendants, as they would have no other reason to brief or prepare arguments for other claims.

some form of expression. There is no expression here, at least not from Belle Garden, a 10-acre wedding venue, or its proprietor. This much is clear from its own argument. Belle Garden's only purported support for its free speech claims is in its briefing, where it argues in passing that "[c]ore First Amendment principles, such as hosting and participating in wedding ceremonies religious or secular, are protected free speech," and cites to *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). (ECF No. 6 at 3.) First, *Pickering* has nothing to do with weddings or gatherings and does not support the proposition for which Belle Garden cites it. In that case, the Court addressed a school's regulation of a teacher's speech and sought to "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. The analysis of whether a state government may censor the speech of its employees is wholly irrelevant to the question before the court in this case, and Belle Garden's arguments provide no basis for the court to conclude that its First Amendment rights are being violated.

Second, Belle Garden's complaint and briefing are devoid of specific factual allegations suggesting that it is involved in any expression related to wedding ceremonies. The complaint does not contain a detailed description of Belle Garden's business, saying only that it "primarily operates as a wedding venue." (ECF No. 1 at 1.) This description gives the court no reason to believe that anything about Belle Garden's business is expressive. The provision of facilities and services for a wedding is not inherently expressive. While it may be the case that some wedding vendors have a claim to First Amendment protections, *see Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719 (2018), Belle Garden does not contend that

9

its services have any unique or expressive elements that could implicate the First Amendment's protections.

Certainly, weddings are expressive events. If this case were brought by a couple who argued that Order 72 somehow infringed on their ability to express their love and union, the court would be obliged to apply a different analysis. But Belle Garden hosts weddings; it does not officiate or participate in them. In certain circumstances, a wedding vendor may be able to invoke the First Amendment rights of participants when challenging a law that injures the vendor, s*ee, e.g.*, *Kaahumanu v. Hawaii*, 682 F.3d 789, 797 (9th Cir. 2012), but here Belle Garden raises only its own First Amendment rights.[2] Because it has not established that it engages in expression, it is unlikely to succeed on the merits with such an argument.

### iii. Equal Protection

Finally, Belle Garden has not shown any likelihood of success on the merits with respect to its Fourteenth Amendment equal protection claim. It argues that Order 72 unconstitutionally discriminates against wedding venues by saddling them with onerous capacity restrictions while allowing similar businesses free rein to host thousands of people. Even if Belle Garden can demonstrate that it is treated differently than other businesses, Order 72 is rationally related to the government's legitimate interest in controlling the pandemic and therefore withstands constitutional scrutiny.

---

[2] In its briefing and at argument, Belle Garden attempted to assert the rights of its third-party patrons. However, as counsel conceded at oral argument, the complaint contains no claims based on the rights of third parties and otherwise does not satisfy the pleading standard. (*See generally* ECF No. 1.)

The first hurdle for Belle Garden's equal protection claim is that it is not treated differently from other businesses. Order 72's limitations on private bookings apply to Belle Garden in the same way they apply to the businesses it claims are receiving preferential treatment. (*See* ECF No. 1-1 at 9–10.) If an amusement park or concert hall (two of the businesses Belle Garden highlights) were to take a private booking, they would be limited to hosting 25 people in an outdoor venue. In fact, every business to which Belle Garden points as receiving preferential treatment is subject to the same restrictions. (*See generally* ECF No. 1-1.) Wedding venues presumably suffer more from the private-booking restriction because their business is entirely private bookings, but their suffering, although real, significant, and unfortunate, is not the result of any disparate treatment. They are subject to the same rules as everyone else.

Even assuming Belle Garden could show it is treated differently, the Equal Protection Clause provides it scant protection. The Fourteenth Amendment's protections against discrimination apply most strongly where a law discriminates based on a suspect or quasi-suspect classification, such as race or gender. *See McLaughlin v. Florida*, 379 U.S. 184, 192 (1964); *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). In such cases, the law is subject to heightened scrutiny, either strict or intermediate, depending on the nature of the discriminatory classification. But when a law does not create or result in suspect classifications, the Equal Protection Clause provides little protection against disparate treatment by state governments. In such cases, the law is subject only to rational basis review and "will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). This is particularly true with respect

to social or economic legislation, where "the Equal Protection Clause allows the States wide latitude." *Id.* The rational basis test is extremely forgiving to the state—proper application rarely results in invalidation of a state law. As the Supreme Court has put it, "the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny. On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)). This deferential review places a heavy burden on Belle Garden. In order to succeed on its equal protection claim, it must demonstrate that Order 72 is not rationally related to *any* legitimate state interest, and that it is so arbitrary as to make animus the only explanation for its enactment.[3]

Not only does Belle Garden's equal protection claim fall under the most deferential form of constitutional review, it also challenges Virginia's actions in an arena where the state's governing authority is at its strongest. Virginia, unlike the federal government, has broad, unenumerated authority to make laws that protect the public health.

A basic premise of the American Constitution is that our federal government is one of enumerated powers. That is to say, the federal government only wields that authority which is specifically allocated to it. Our Constitution, a relatively short document, contains an exhaustive list of everything the federal government is allowed to do. When the President or

---

[3] In its reply brief, Belle Garden attempts to argue—for the first time—that Order 72 discriminates on the basis of religion, a protected class. (*See* ECF No. 18 at 4.) This argument is undermined by the plain language of the Order itself. The religious status or affiliation of a business has no effect on the capacity at which it may operate under Order 72.

12

Congress takes an action that it cannot root in a specific constitutional authorization, its action is unconstitutional and must be struck down.

State governments have no such constraint on their authority. As James Madison said, "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." James Madison, The Federalist No. 45, 292-93 (C. Rossiter ed. 1961). Among the states' various wells of authority is the police power, what the Supreme Court has called the "general power of governing." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012). The Constitution acknowledges the retention of the police power by the states in the Tenth Amendment, which states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend X.

Protection of the public health has long been recognized as a valid end of the police power. Dating back to the colonial era, states have regularly passed laws to protect the public from disease. *See* James G. Hodge, Jr., *The Role of New Federalism and Public Health Law*, 12 J.L. & Health 309, 325 (1998); James A. Tobey, *Public Health and the Police Power*, 4 N.Y.U. L. Rev. 126 (1927). More than a century ago, the Supreme Court recognized the authority of states to legislate for the public health when it held the police power enabled Massachusetts to mandate that individuals in the town of Cambridge receive the smallpox vaccine because the disease had become "prevalent" there. *See Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905). The Court said:

> The authority of the state to enact this statute is to be referred to what is commonly called the police power,—a power which the

> state did not surrender when becoming a member of the Union under the Constitution. Although this court has refrained from any attempt to define the limits of that power, yet it has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate to matters completely within its territory and which do not by their necessary operation affect the people of other states. According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety . . . .

*Id.* at 24–25.

It is the exercise of this power that Belle Garden now challenges. Of course, the Equal Protection Clause does not countenance unconstitutional exercises of the police power in pursuit of public health. But though Virginia's actions are subject to constitutional scrutiny, the fact that the state is exercising one of its broadest powers is surely relevant here. When considering whether Order 72 is rationally related to any legitimate state interest, the court must consider the nature of the power wielded by the state and the legitimacy of the end it seeks to accomplish.

In light of these considerations (or, in truth, even ignoring them), Belle Garden cannot show any likelihood of success on the merits with respect to its equal protection claim. Order 72 is plainly related to a legitimate state interest: the control of COVID-19, which, as of this date, has killed 10,147 Virginians and infected roughly 590,000 others.[4] Belle Garden responds that Order 72 is arbitrary insofar as it distinguishes wedding venues from other entertainment businesses and private bookings from public gatherings. But the Governor points out that

---

[4] Virginia Department of Health COVID-19 Public Use Data Set, https://data.virginia.gov/Government/VDH-COVID-19-PublicUseDataset-Cases/bre9-aqqr (last visited Mar. 26, 2021).

private bookings are different from gatherings of strangers because they are composed of friends and family. The Governor argues that such gatherings pose a greater risk of viral transmission both because the purpose of the gathering is for the participants to socialize, and because the participants themselves are familiar with one another and therefore likely to have longer and more intimate interactions. (*See* ECF No. 14 at 19–20; ECF No. 14-1 at 4–6.) This common-sense justification is sufficient to demonstrate that Order 72 is likely rationally related to a legitimate state interest of controlling the spread of a deadly and contagious virus among its citizenry.

### B. Irreparable Harm

Belle Garden has also failed to demonstrate that it will suffer irreparable harm if the court does not issue a preliminary injunction. The only injury mentioned in its filings is monetary. (*See* ECF No. 1 at 6–1; ECF No. 6 at 5.) Absent extraordinary circumstances, monetary damages do not qualify as irreparable harm sufficient to justify a preliminary injunction. *See Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). When evaluating whether a party's potential damages justify a preliminary injunction,

> The key word . . . is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974).

There are exceptions to this general rule. For example, if the monetary damages to be inflicted threaten a plaintiff's existence, it may be able to demonstrate irreparable harm. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). But such exceptions

15

are "quite narrow, reflecting instances where the harm suffered by the plaintiff from denying the injunction is especially high in comparison to the harm suffered by the defendant from granting it." *Hughes*, 17 F.3d at 694. Moreover, Belle Garden has not demonstrated, or even argued, that there are exceptional circumstances present in this case that would transform its monetary damages into an irreparable injury. Its claimed damages (estimated at $5,000 to $8,000 per cancelled wedding) are the paradigmatic example of a reparable harm—that which the court could remedy with an award at the conclusion of the case. If Belle Garden succeeds in its challenge and demonstrates that the government (through a properly named defendant) unlawfully caused it to lose money, this court will have no trouble making it whole again. Therefore, Belle Garden has not demonstrated any irreparable harm, and the second factor of the preliminary injunction test weighs against issuance of an injunction.

### C. Balance of the Equities and Public Interest

Finally, Belle Garden has not demonstrated that the balance of the equities or the public interest counsel the issuance of an injunction. These two elements are often considered together, especially when the government is the party opposing an injunction. *See, e.g., Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020); *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017); *Nken v. Holder*, 556 U.S. 418, 435 (2009). The equities and the public interest weigh strongly against an injunction in this case. Demonstrating why this is the case requires going no further than the preamble of Order 72 itself, which notes that Virginia is currently averaging more than 2,000 new COVID-19 cases *each day* with a PCR test positivity rate of 8.3 percent. (ECF No. 1-1 at 1.) To put it another way, if the court issues a preliminary injunction in this case, there is a reasonable likelihood that more people will become infected and/or die than if

it does not. This is, to put it mildly, a compelling argument that the public interest weighs against an injunction. Certainly, it outweighs Belle Garden's argument that it is being unfairly deprived of money.[5] To hold otherwise would border on the hypocritical. This court has suspended in-person operations for the last year because it believes that the public interest in avoiding the transmission of COVID-19 is so strong. This is not to say that Order 72 is somehow immune from review because of the pandemic, only that the equities and public interest—at least at the current time—weigh against preventing its enforcement prior to a full review of the case on the merits.

### III.   CONCLUSION

Belle Garden is unlikely to succeed on the merits of its First and Fourteenth Amendment claims, has not pleaded irreparable harm, and has failed to demonstrate that the equities or public interest weigh in favor of an injunction. The court will therefore deny its motion.

---

[5] The court does note, however, that the data cited in the Governor's order grow more favorable with each passing day. While it is easy to say that the public interest weighs against enjoining Order 72 at the moment, the possibility of infectious disease is not talisman against injunctive relief. If the pandemic continues to abate, the court may be obligated to scrutinize the purported justifications for restrictions that individuals and businesses, like Belle Garden, contend impose of their constitutional rights.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 26th day of March, 2021.

/s/ *Thomas T. Cullen*
_____
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE